IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOAH ALEXANDER GASPERO,                )
                                       )
                  Plaintiff,           )
                                       )
            v.                         )    C.A. No. 22-86 (MN) (JLH)
                                       )
KILOLO KIJAKAZI, Acting Commissioner   )
of Social Security,                    )
                                       )
                  Defendant.           )

## **<u>MEMORANDUM OPINION</u>**


Stephen A. Hampton, Esquire, GRADY & HAMPTON, Dover, DE; David F. Chermol, CHERMOL & FISHMAN, LLC, Philadelphia, PA – Attorneys for Plaintiff

David C. Weiss, United States Attorney, Brian C. O'Donnell, Associate General Counsel, Evelyn Rose Marie Protano, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Baltimore, MD – Attorneys for Defendant


March 31, 2023
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE

 Presently before the Court are the objections (D.I. 28) of Plaintiff Noah Alexander Gaspero ("Plaintiff") to Magistrate Judge Hall's December 21, 2022 Report and Recommendation (D.I. 27) ("the Report").  The Report recommended (1) denying Plaintiff's motion for summary judgment (D.I. 16) and (2) granting Defendant's cross-motion for summary judgment (D.I. 19).  The Court has reviewed the transcript of the November 15, 2022 proceeding, the Report (D.I. 27), Plaintiff's objections (D.I. 28) and Defendant's response thereto (D.I. 31), and the Court has considered *de novo* the objected-to portions of the Report, the relevant portions of the motions and the supporting documentation (D.I. 16, 17, 19, 20, 21).  For the reasons set forth below, Plaintiff's objections are OVERRULED, the Report is ADOPTED, Plaintiff's motion for summary judgment (D.I. 16) is DENIED, and Defendant's cross-motion for summary judgment (D.I. 19) is GRANTED.

## I. BACKGROUND

### A. Procedural History

 In December 2019, Plaintiff filed for child's insurance benefits (CIB) and supplemental security income ("SSI"), alleging disability as of February 5, 2017 due to amplified musculoskeletal pain syndrome ("AMPS"), ulcerative colitis and hypermobility, with later complaints of dizziness and heart palpitations.  (Tr. 71, 77, 85, 90, 172-86, 203).  His applications were denied initially and on reconsideration.  (Tr. 95-104, 110-17).  Plaintiff requested a hearing, which was held on February 23, 2021.  (Tr. 28-68, 118-23).  Plaintiff (appearing *pro se* following a colloquy on representation with the administrative law judge ("ALJ")), his father, and a vocational expert (VE) appeared and testified.  (Tr. 28-68).

 On April 27, 2021, the ALJ issued a decision finding Plaintiff not disabled.  (Tr. 15-22).  Plaintiff's request for review was denied (Tr. 1-6), and this appeal followed.  The appeal was briefed (D.I. 17, 20, 21) and referred to Magistrate Judge Hall for decision.  On

December 22, 2022, Judge Hall issued the Report recommending that Plaintiff's motion be DENIED and Defendant's cross-motion be GRANTED. Thereafter, Plaintiff timely objected, and Defendant responded to the objections. (D.I. 28. 31).

### B.   Factual History

In March 2015, Plaintiff was diagnosed with ulcerative colitis. (Tr. 315, 423). A few months later, in October 2015, he was hospitalized with a *C. diff* infection in his large intestine. (Tr. 315, 423). Plaintiff reported other symptoms that consultants suggested might be AMPS. (Tr. 525). As of the February 2017 alleged onset date, Plaintiff's gastrointestinal symptoms were controlled by medication. (Tr. 525). He had additional *C. diff* infections in April, May and July 2017. (Tr. 424, 435, 479, 482-83, 510-22). After treatment, his symptoms resolved. (Tr. 424).

In July 2017, Plaintiff saw Sabrina A. Gmuca, M.D., for complaints of whole-body pain, which he rated as 20/10. (Tr. 499). On examination, Plaintiff had tenderness in the elbow, but normal gait, strength, and range of motion. (Tr. 501-02). He was diagnosed with AMPS. (Tr. 502). Dr. Gmuca noted that arthralgias are frequently being seen in the setting of irritable bowel disease (IBD), told Plaintiff that medication is not helpful for AMPS and referred him to physical therapy. (Tr. 502).

From July to October 2017, Plaintiff underwent physical therapy for AMPS. (Tr. 453-56, 464-66, 469-78, 485-92). He reported high levels of pain, often 10 out of 10. (Tr. 454-55, 457, 459, 464, 470, 472, 474, 475, 477, 486-87). At his initial appointment, he had maximum hypermobility at the shoulders and fingers, although he had intact strength, good balance and no significant gait deviation. (Tr. 489). The same day, the therapist noted that his pain behavior was incongruent with his pain reports. (Tr. 487). At other early appointments, observed pain behavior was also inconsistent with reported pain (Tr. 473-74), and at one appointment there was no observed pain behavior despite complaints of 10/10 pain (Tr. 478). Even so, Plaintiff completed

all of his activities, pushed harder during cardio, and improved his mileage on a recumbent bicycle. (Tr. 454, 456, 458-59)  By the end of treatment, it was noted that his pain reports were not reflected in his performance.  (Tr. 454).

On September 14, 2017, Plaintiff saw gastroenterologist Melissa Kennedy, M.D., for a follow up of his *C. diff* infections.  (Tr. 466).  He reported 3 partially formed stools daily.  (Tr. 466). The doctor determined that Plaintiff's next steps would depend on if his diarrhea reoccurred, and if he tested positive for *C. diff* again.  (Tr. 468).

On September 25, 2017, Plaintiff saw his primary care doctor for a fever, ear pain, diarrhea, and nausea.  (Tr. 462).  He was sent to the emergency room with concerns for pneumonia, but ultimately after a chest x-ray, he was discharged home.  (Tr. 294, 299).  He was to follow up with gastroenterology regarding his diarrhea.  (Tr. 299).  When he followed up with primary care four days later, Plaintiff reported feeling better, although he still had body aches, which his mother said were standard for him and due to AMPS.  (Tr. 460).

In November 2017 and March 2018, Plaintiff returned to Dr. Kennedy.  (Tr. 446, 451). Despite reports of abdominal pain, Plaintiff had formed stools every day or every other day. (Tr. 446, 451).  His *C. diff* infection and symptoms had resolved.  (Tr. 447, 452).  At his March appointment, Dr. Kennedy noted that Plaintiff's ulcerative colitis was quiescent.  (Tr. 447). Although Dr. Kennedy was concerned about his flat affect, Plaintiff was interactive and normal, with no obvious anxiety or depression.  (Tr. 447, 452).  Dr. Kennedy recommended a colonoscopy and endoscopy; if those were stable, she recommended a focus on AMPS treatment and pain management, and treatment for behavioral health.  (Tr. 447).  If disease was identified, she would consider an escalation in therapy.  (Tr. 447).

3

In August 2018, Plaintiff saw his primary care doctor for complaints of low back pain and pain with walking. (Tr. 441-42). A previous x-ray showed possible mild degenerative disc disease in his lower back, and he had mild pain with hyperextension of the lower back, but no pain with palpation of the spine. (Tr. 442). He was prescribed Tylenol as needed for pain. (Tr. 442).

In September 2018, Plaintiff had no significant complaints for Dr. Kennedy, although he had lost some weight. (Tr. 439). He reported one formed stool per day and his blood work showed no evidence of anemia, hypoalbuminemia, or elevated inflammatory markers. (Tr. 439-440). Dr. Kennedy recommended an endoscopy and colonoscopy. (Tr. 440). He was encouraged to follow up with psychology, but he said mental health treatment was not covered by his insurance. (Tr. 440). At a well visit a few months later, his stool was again normal. (Tr. 436).

In March 2019, Plaintiff established care with a primary care provider at ChristianaCare. (Tr. 1026). Plaintiff reported that he had discussed biologics for ulcerative colitis but was hesitant. (*Id.*). His new provider thought Plaintiff would benefit from a possible transition to biologics and transition to adult rheumatology was also suggested for his AMPS. (Tr. 1027).

In August 2019, Plaintiff returned to ChristianaCare, noting he had no recent bloody bowel movements and that he was going to start Remicade (a biologic). (Tr. 1009). He reported that he felt "fine," although there were times he was angry. (*Id.*). He also noted that he had recently talked with his father regarding his mother's death for the first time. (*Id.*). His provider felt he would benefit from counseling, and referred him back to gastroenterology. (*Id.*).

At visits in September and October of 2019 with Dr. Kennedy, Plaintiff reported continued abdominal pain, but reported one formed stool per day. (Tr. 423, 434). A repeat endoscopy and colonoscopy revealed ongoing mild to moderate inflammation. (Tr. 424). Given the inflammation

and pain, it was recommended that he begin Remicade therapy.  (Tr. 424).  He was also told to use Miralax, Prilosec and a daily probiotic, and to increase fiber.  (Tr. 425).

On November 14, 2019, Plaintiff received his first Remicade infusion.  (Tr. 422).  The next day, he felt dizzy, but was not sick to his stomach and had no headaches.  (Tr. 422).  Plaintiff returned to Dr. Kennedy on January 9, 2020, reporting bowel movements every other day that were large and hard to pass, but his labs were consistent with clinical improvement.  (Tr. 620, 622).  Although Plaintiff reported pain, Dr. Kennedy felt it was not related to ulcerative colitis, but rather constipation or AMPS.  (Tr. 622).  She suggested Miralax and physical therapy.  (Tr. 622).

In January 2020, Plaintiff told his ChristianaCare provider that following Remicade, he had no bloody stools or diarrhea; his inflammatory markers responded well.  (Tr. 976).  Plaintiff also reported pain that was hard to control; he had not been to physical therapy in years, although he did exercises at home.  (Tr. 976).  He was referred to the AMPS clinic and physical therapy.  (Tr. 977).  In March 2020, Plaintiff returned to ChristianaCare for complaints of dizziness and palpitations.  (Tr. 987).  He also reported chronic headaches from Remicade.  (*Id.*).  His doctor felt AMPS may be causing some symptoms, and he referred Plaintiff to rheumatology.  (*Id.*).

In May 2020, Plaintiff was seen by rheumatology for an initial visit.  (Tr. 1082).  Despite a history of ulcerative colitis, he had no weight loss, diarrhea, or rectal bleeding.  (Tr. 1082).  He had a history of hypermobility and now had complaints of pain in his arms, knees, and mid-back.  (Tr. 1082).  Plaintiff also reported a low mood but noted that his insurance would not cover mental health visits.  (Tr. 1082).  Plaintiff's hypermobility was "certainly not severe;" the doctor recommended aerobic and muscle toning exercises and a primary care visit for mental health.  (Tr. 1083).

5

At a July 2020 appointment, Dr. Kennedy noted that Plaintiff was doing well after starting Remicade.  (Tr. 928).  He reported some fatigue after infusions and pain secondary to AMPS, but his abdominal pain was mild and improving, and he reported one formed stool per day.  (Tr. 928). She reported that his disease was quiescent; he had a good response to Remicade with improvement in symptoms and labs; and she recommended continued Remicade every 8 weeks. (Tr. 930).   Plaintiff saw rheumatology in July, September, and October 2020 for his musculoskeletal pain complaints.  (Tr. 1056, 1065, 1074).  He reported some crampy abdominal pain without weight loss, diarrhea, or blood in his stool; his ulcerative colitis appeared controlled. (Tr. 1056, 1065).

Plaintiff also reported low mood but denied severe anxiety.  (Tr. 1065).  He was previously prescribed medications for his pain, but reported he only benefitted from yoga.  (Tr. 1056, 1065, 1074).  In October, Plaintiff had a shuffling gait and minimal hypermobility in his arms.  (Tr. 1056-57).  The rheumatologist felt he was not really in the pathological range of hypermobility and expected it to lessen over time.  (Tr. 1057).   Plaintiff was referred to physical therapy and prescribed low dose tizanidine.  (Tr. 1057).

In November 2020, Plaintiff told Dr. Kennedy he had no diarrhea or other symptoms of IBD, consistent with a good response to Remicade.  (Tr. 924, 926).  Dr. Kennedy recommended Remicade every eight weeks.  (Tr. 926).  Plaintiff reported he was looking into physical therapy for AMPS and was doing an hour of yoga daily.  (Tr. 924).  Dr. Kennedy felt Plaintiff's pain was likely related to AMPS, as his ulcerative colitis was well controlled.  (Tr. 926).  On December 17, 2020, Plaintiff called to report diarrhea for the past several days, with three to four stools per day with no blood present.  (Tr. 923).  Stool studies were recommended.  (Tr. 924).  Eleven days later, Plaintiff called the office due to diarrhea despite use of Imodium.  (Tr. 922).  His stool studies

were negative, and an IBD flare was suspected.  (Tr. 922).  Uceris (budesonide) was added to his medications.  (Tr. 922).  On December 31, 2020, Plaintiff called again due to episodes of bloody diarrhea.  (Tr. 921).  He still did not have the prescribed Uceris.  (Tr. 921).  Plaintiff was told that Dr. Kennedy was out of the office, so another doctor would call it in.  (Tr. 921).

On January 6, 2021, Plaintiff told his provider at ChristianaCare that he had a flare of diarrhea, but that budesonide resulted in significant improvement.  (Tr. 1047).  He also just had a Remicade injection.  (Tr. 1047).  Plaintiff had not yet contacted physical therapy for his AMPS. (Tr. 1047).  He was told it was critical to restart and continue taking tizanidine.  (Tr. 1048). Plaintiff returned to ChristianaCare in March 2021.  (Tr. 1001).  He had been started on tizanidine in January; he had tapered off and now his pain was adequately controlled.  (Tr. 1000).  Plaintiff also noted the flare of ulcerative colitis a few months earlier but was now on budesonide and currently had normal bowel movements without blood.  (Tr. 1000).

On April 7, and June 24, 2020, state agency physicians Darrin Campo, M.D., and Vinod Kataria, M.D., reviewed the record and opined that Plaintiff could perform light work where he could never climb ladders, ropes, or scaffolds; frequently perform other postural activities, and should avoid moderate exposure to vibration and concentrated exposure to hazards. (Tr. 73-75, 91).

### C.   **The Hearing**

#### 1.    **Michael Gaspero's Testimony**

Upon questioning by the ALJ, Michael Gaspero, Plaintiff's father, testified that due to Plaintiff's AMPS he is in constant pain – at a level of nine out of ten most of the time.  (Tr. 42). He reported that they had tried physical and occupational therapy, yoga, swimming, and any other activity the University of Pennsylvania suggested.  (*Id*.).  He testified that Plaintiff can do things, but within several minutes he will complain that he cannot do it anymore.  (Tr. 46-47).

Michael Gaspero also testified that Plaintiff can only take Tylenol for pain (which he said does not help) because he is allergic to or had very bad side-effects to all other medications the doctors tried.  (Tr. 44).  Further, he testified that Plaintiff has had bouts of explosive diarrhea where he would be in the bathroom for up to two hours at a time (Tr. 43) and explained that Plaintiff started developing migraines from the pain (Tr. 46).

### 2.    Noah Gaspero's Testimony

Plaintiff testified that his pain feels "like a sharp blade cutting into" him, that the pain is all over his body, it starts immediately upon his waking up and that it gets worse with strenuous activities.  (Tr. 50-51).  He further testified that he does not do much around the house other than sometimes taking out the trash, helping to put dishes away, and going grocery shopping with his dad.  (Tr. 51).  Additionally, he testified that there are periods when he goes to the bathroom a lot and during those times, he has pain in his stomach.  (Tr. 53).  Finally, he testified that he was offered a job at UPS but turned it down because the location was too far away.  (Tr. 54).

### 3.    Vocational Expert Testimony Before the ALJ

The following is the hypothetical question-and-answer exchange between Adina Leviton, Ph.D., the vocational expert, and the ALJ:

> ALJ:  . . . assume a hypothetical individual could occasionally lift 20 pounds, frequently lift 10 pounds, could stand and/or walk six hours out of an eight-hour workday, could sit six hours out of an eight-hour workday, could frequently climb ramps and stairs, never climb ladders, ropes, or scaffolds, could frequently balance, stoop, kneel, crouch, and crawl. Can tolerate occasional exposure to vibrations, and could tolerate frequent expose to hazards. Is there any work this hypothetical individual could perform?
>
> Dr. Leviton:  Yes, sir. At the light exertional level, these will all be SVP 2. We have inspector, DOT 559.687-074. There are approximately 50,000 nationally. We have sorter, DOT 361.687-014. There are approximately 60,000 nationally. And we have assembler, small products, DOT 739.687-030. 49,000 nationally.

ALJ: . . . Assume a hypothetical individual that would have that would be off task anywhere from 20 to 30 minutes per hour, as a result of problems relating to pain. Would there be any jobs for this hypothetical individual?

Dr. Leviton:  If an individual is off task for that amount of time, they would have a loss of productivity well over 15%, and they would not maintain employment.

ALJ:  Assume a hypothetical individual who would be periods -- need anywhere between 15 to 20 minutes per day unexpected breaks of 20 to 30 minutes per day, where they would need to leave the workplace, as a result of the problems that they were experiencing, whether it be abdominal pain, would need to go for bathroom breaks, whatever the case may be, but they would need to leave the work site, would there be any Jobs for this hypothetical individual?

Dr. Leviton:  . . . That, in and of itself, would not necessarily be work preclusive. It would certainly catch a supervisor's attention. The bottom line would be if the individual is still able to be productive, with that additional 15 to 20-minute break that they need to take, once they're -- that break time impacts their ability to maintain productivity, and they have a loss of productivity at 15% or more, at that point they would not maintain employment.

ALJ:  Assume the hypothetical individual that would need a period of two to three days per month absences, and those two to three days would also include days where they would come in late, because of conditions that they experience, or even leave work early, as a result of it -- so the two or three days are just not straight absentee, they would be two to three days which would be late absence -- or coming in late, or leaving work early. Would these -- would this hypothetical individual be able to perform any work that exists in the national economy?

Dr. Leviton:  If an individual was doing that consistently, over time they will not maintain employment. . . . Loss of productivity is the main issue. And employers especially with entry-level jobs, the employer needs the jobs getting done, and those positions are easily refilled.

ALJ:  And finally, one more hypothetical individual that would be able to maintain – would be able to perform the past work that you indicated, however, during the course of the normal day they would have periods of time where they'd be off task anywhere between 15 to 20-minute – I know I said half an hour, but I want to drill it down

9

a little more – 15 to 20 minutes every hour, where they'd still be at their workstation, however, they just would not be able to perform any of their tasks during that time period because the pain would be do disruptive that they would not be able to concentrate, or focus, or do any of those tasks during that 15 to 20-minute time period, even though they're still at their workstation. Could that hypothetical individual perform any work that exists in the national economy, or any of the jobs that you've identified already?

Dr. Leviton:   No, sir, because that would result in a loss of productivity at 15% or more.

(Tr. 59-62).   The ALJ also confirmed that Dr. Leviton's testimony was consistent with the Dictionary of Occupational Titles.  (Tr. 62).

Plaintiff requested that the ALJ ask an additional question regarding whether if the hypothetical individual would need to spend an hour to two hours in the bathroom during a normal workday that would impact the person's ability to maintain employment and Dr. Leviton testified that individual would be off task greater than 15% during the workday and would not be able to maintain employment.  (Tr. 63).

**D.**   **The ALJ's Findings**

Based on the factual evidence in the record and the testimony by the Gasperos and the VE, the ALJ determined that Claimant was not disabled under the Act for the relevant time from the February 5, 2017 disability onset date through April 27, 2021, the date of the ALJ's decision. (Tr. 17-22).  The ALJ found, in pertinent part:

1.   Born on February 5, 2001, the claimant had not attained age 22 as of February 5, 2017, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2.   The claimant has not engaged in substantial gainful activity since February 5, 2017, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.   The claimant has the following severe impairments: ulcerative colitis, amplified musculoskeletal pain syndrome

(AMPS), and hypermobility syndrome (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently climb ramps and stairs, but never climb ladders, ropes, and scaffolds; he can frequently balance, stoop, kneel, crouch, and crawl; he can tolerate occasional exposure to vibration, and he can tolerate frequent exposure to hazards.

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on February 5, 2001 and was 16 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 5, 2017, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 17-22).

On December 21, 2022, Judge Hall issued the Report recommending Plaintiff's motion for summary judgment be denied and that Defendant's cross-motion for summary judgment be granted.  (D.I. 27).  Plaintiff timely objected to the Report (D.I. 28) and Defendant responded to the objections (D.I. 31).

## II.    LEGAL STANDARDS

The power vested in a federal magistrate judge varies depending on whether the issue to be decided is dispositive or non-dispositive.  "Unlike a nondispositive motion (such as a discovery motion), a motion is dispositive if a decision on the motion would effectively determine a claim or defense of a party."  *Equal Employment Opportunity Commission v. City of Long Branch*, 866 F.3d 93, 98-99 (3d Cir. 2017) (citations omitted).  For reports and recommendations issued for dispositive motions, "a party may serve and file specific written objections to the proposed findings and recommendations" within fourteen days of the recommended disposition issuing and "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  FED. R. CIV. P. 72(b)(2)-(3); *see also* 28 U.S.C. §§ 636(b)(1)(B)-(C); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

## III.    DISCUSSION

In his objections, Plaintiff argues that he was unrepresented by counsel at the hearing and that the lack of counsel prejudiced him or resulted in an unfair administrative proceeding.  (D.I. 28 at 1).  Plaintiff also claims that "it is reversible harmful legal error for the ALJ to not include all work restrictions stemming from the combination of the signs and symptoms from Mr. Gaspero's impairments."  (*Id.*).

### A.    Plaintiff's Lack of Counsel

As the Commissioner points out, "Plaintiff's overarching argument is that he was unrepresented at the hearing, and that, with representation, an attorney could have made better

arguments regarding his claim."  (D.I. 31 at 1 (citing D.I. 28 at 1, 10)).  "[T]he mere fact that a claimant is unrepresented by counsel[, however,] is not alone sufficient for remand, rather, remand is appropriate only where 'the lack of counsel prejudiced the claimant or . . . the administrative proceeding was marked by unfairness due to lack of counsel.'"  *Tuulaupua v. Colvin*, No. 14-1121, 2015 WL 5769984, at *3 (W.D. Pa. Sept. 30, 2015) (quoting *Livingston v. Califano*, 614 F.2d 342 (3d Cir. 1980)).

Here, Plaintiff has not shown clear prejudice from his lack of counsel – indeed, Plaintiff made a knowing and intelligent waiver of his right to representation, confirmed that he reviewed his medical records, and told the ALJ that nothing was missing.  (Tr. 34-35, 37-38, 269).  Even so, after the hearing, the ALJ independently sought and obtained additional evidence.  (Tr. 282-83). Plaintiff has not clearly shown unfairness or prejudice simply because he believes better arguments could have been made by an attorney.

### B.    The ALJ's Decision

Plaintiff asserts that the ALJ's finding is defective because it did not include all of the work restrictions stemming from the combination of Mr. Gaspero's impairments.  In particular, Plaintiff argues that the ALJ did not properly consider his autoimmune disorders, headaches from his conditions as well as medication, pain and limitations from his Remicade treatment, his ulcerative colitis and his mental health issue.  (D.I. 28).

First, Plaintiff asserts that he "unquestionably" had autoimmune disorders, and that the ALJ was required to "uncover all the functional limitations from both the autoimmune disorders itself along with the necessary treatment and clarify all the variables and unique symptomology that each claimant faces."  (D.I. 28 at 1-2 (citing to the Listings at Section 14.00 and its subparts

to support his arguments)).[1]   The ALJ did, however, properly address Plaintiff's autoimmune disorders.  The ALJ considered Mr. Gaspero's ulcerative colitis pursuant to Listing 5.06.  (Tr. 18).  *See* 20 C.F.R., pt. 404, subpt. P, app. 1, § 5.00(E) (explaining inflammatory bowel disease (found at Listing 5.06) includes, but is not limited to, diseases such as ulcerative colitis).  Additionally, the ALJ considered Plaintiff's joint hypermobility syndrome pursuant to Listing 1.18 ((abnormality of a major joint(s) in any extremity) (Tr. 18)), as that Listing includes, among other things, abnormal joint motion – the issue Plaintiff had with hypermobility.  *See* 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.18.

Second, Plaintiff argues that his headaches are a "primary symptom" of his "rare autoimmune disorders," as well as a side effect from medication.  (D.I. 28. at 1-3).  Plaintiff argues that his headaches would result in functional limitations such as difficulty sustaining attention and concentration, requiring unscheduled breaks. ( *Id.* at 1-2 (citing Social Security Ruling (SSR) 19-4p)).  Plaintiff, however, acknowledges that his headaches are either caused by medication side effects or from another condition.  (*Id.* at 1-3).  As explained in the Commissioner's opening brief (D.I. 17 at 12-14) and the Report (D.I. 27 at 4 & n.5), SSR 19-4p only applies to primary headaches.  *See* SSR 19-4p, 2019 WL 4169635, at *3, 5 (secondary headaches are a symptom of another condition, and that the agency "will not establish secondary headaches" as a medically determinable impairment).  SSR 19-4p is thus not relevant to Plaintiff's headaches.

To the extent Plaintiff's headaches were a side effect of medication, the Third Circuit has explained that side effects often accompany medication use, and such side effects "should not be viewed as disabling unless the record references serious functional limitations" related to them.

---

[1]   Plaintiff has not pointed to which specific Listing he believes he met – he only cites the definitions found at Section 14.00, which more generally explain immune system disorders (D.I. 28 at 3, citing Sections 14.00B, E, G, H, and I).

*Rutherford v. Barnhart*, 399 F.3d 546, 555 (3d Cir. 2005).  And Plaintiff has not shown that his headaches cause serious functional limitations caused by medication side effects – rather, the record shows that they were limited.  (*See* Tr. 239 (reporting headaches as a side effect in a report to the agency); Tr. 987 (the only notation to a doctor that Plaintiff reported headaches as a side effect)).  Plaintiff points out that the ALJ did not mention his headaches, but the Court does not find that to be error.  As noted in the Commissioner's opening brief, Plaintiff's citations to the record do not support headache-related limitations during the relevant period.  (D.I. 17 at 13).  Those citations reflect Plaintiff's subjective statement at the hearing (Tr. 46); that Plaintiff underwent an MRI in 2015 due to headaches (which was normal) (Tr. 487, 492, 499, 535, 679, 683, 689, 720, 722); that headaches were a potential (but not actual) side effect of Remicade (Tr. 425); that Plaintiff complained of headaches twice in early 2016 (a year before his alleged onset date) (Tr. 343, 349, 538-39, 723); and that his mother had a history of headaches (Tr. 437).  (D.I. 28 at 1-2).  Plaintiff only mentioned headaches one other time.  (Tr. 1082).  The ALJ was "only required to submit credibly established limitations" in the RFC.  *Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014).  Plaintiff has not shown that greater limitations were credibly established based on his headaches.  Thus, the ALJ did not err in failing to further discuss headaches.

Third, Plaintiff argues that the record supports further limitations in his ability to walk, stand, and carry given his pain complaints.  (D.I. 28 at 4-5).  The Court agrees with Defendant, however, that "this is merely a request to reweigh the evidence, contrary to the standard of review." (D.I. 31 at 4 (citing *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) (reviewing courts "are not permitted to reweigh the evidence or impose their own factual determinations"))).  The ALJ explicitly discussed that in January 2020 Plaintiff had some balance issues, but did not return to therapy (Tr. 20, citing Tr. 976-77), and that in October 2020, Plaintiff had a somewhat

stilted gait (Tr. 20, citing Tr. 1057).  To the extent Plaintiff believes other evidence should have

been discussed, an ALJ "need not 'make reference to every relevant treatment note in a case where

the claimant . . . has voluminous medical records.'"  *Martin v. Comm'r of Soc. Sec.*, 547 F. App'x

153, 160 (3d Cir. 2013).[2]

Plaintiff argues that the ALJ improperly assessed "zero work restrictions" on walking and

standing.  (D.I. 28 at 4-5).  The only physicians to evaluate Plaintiff's functioning, however, agreed

that that Plaintiff could perform light work, standing/walking for six hours per day.  (Tr. 73-75,

91).  And the ALJ explained that these findings were persuasive, as they were well-explained and

consistent with the evidence, including his treatment and examination findings.  (Tr. 21, 73-75,

91).  There is no evidence that any doctor found Plaintiff's ability to stand and walk more limiting,

and thus Plaintiff has failed to show any error.

Fourth, Plaintiff argues that his Remicade treatment would result in absenteeism with

concentration issues.  (D.I. 28 at 5).  The Court, however, agrees with the Report that there is no

showing that Plaintiff could not schedule his injections around work.  (D.I. 27 at 5 n.8, citing *Stull*

*v. Saul*, No. CV 19-227-E, 2020 WL 5774895, at *1 n.1 (W.D. Pa. Sept. 28, 2020)).  Additionally,

Plaintiff only required Remicade injections every two months (Tr. 48, 926, 930), and Plaintiff's

father testified that the injections took 3.5 to 4 hours, not a full day (Tr. 65).  Even accepting that

Plaintiff would be absent a full day for each injection (6 days per year), the vocational expert

testified that this level of absenteeism would not preclude work.  (Tr. 66 (12+ absences per year

---

[2]    Many of the pages Plaintiff cites are duplicates that predate Plaintiff's alleged onset date
(Pl.'s Br. at 4, citing Tr. 346 (March 4, 2016); 540, 542, 725-27 (August 29, 2016); 535,
537, 722 (September 1, 2016)), and others merely list Plaintiff's mobility in a "problem
list" (Tr. 1047, 1065).  *See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (mere
diagnosis is insufficient to prove disability; there must be a showing of functional loss).

would be work-preclusive)).  And although Plaintiff asserts that his Remicade side effects resulted in limitations, these appear to be minor and/or dissipate quickly.  (Tr. 19-21, 623, 928).

Fifth, Plaintiff argues that his Remicade infusions did not adequately control his symptoms, and that medication did not reduce the pain from his amplified musculoskeletal pain syndrome, citing to the testimony of Plaintiff's father.  (D.I. 28 at 5-6).  Notably, the ALJ discussed this testimony in the decision.  (Tr. 19).  In doing so, the ALJ noted Mr. Gaspero's statement that he only used Tylenol and had reactions to prescribed pain medications; that his diarrhea was not helped by medication; and that after he switched to Remicade, he had a reaction of explosive diarrhea.  (Tr. 19, 43-44).  The ALJ also discussed evidence that ran contrary to these statements.  (Tr. 20).  For example, the ALJ noted Plaintiff's reported intolerance or lack of effect with certain medications, did not return to physical therapy as recommended, but did yoga regularly and treated with Tylenol.  (Tr. 20, citing Tr. 620, 631, 640-42, 976, 987, 1048, 1056; *see also* Tr. 924, 1047). The ALJ also noted that Plaintiff started Remicade for ulcerative colitis in 2019 with good response, and although Plaintiff had diarrhea in December 2020, he did not have access to medication; by January 2021 he had significant improvement.  (Tr. 20, 926 (good response to Remicade), 928, 930 (doing well after starting Remicade with a good response), 976 (inflammatory markers responded well to Remicade); *see also* Tr. 921-24, 1047 (diarrhea flare in December 2020, but significant improvement by January 2021)).  The ALJ also noted that Plaintiff tapered himself off medication (tizanidine) in March 2021 due to adequate pain control.  (Tr. 20, Tr. 1000, 1047-48, 1057).  The ALJ thus properly considered Plaintiff's father's statements, as well as the record, in evaluating his claim, noting his general improvement with Remicade, his conservative treatment, his failure to return to physical therapy, and his reports of adequate pain control with tizanidine.

Plaintiff also asserts that he had insurance barriers and cost issues preventing him from obtaining treatment.  (D.I. 28 at 6-7 & n.2).  The Court agrees with Defendant that Plaintiff did not raise this as an argument in his opening brief, and it is therefore waived.  (D.I. 31 at 7 (citing *Jimenez v. Barnhart*, 46 F. App'x 684, 685 (3d Cir. 2002) (finding an issue raised for the first time in an objection to a magistrate judge's R&R to be "deemed waived"); *see also Harris v. Dow Chemical Co.*, 586 F. App'x 843, 846 (3d Cir. Sept. 29, 2014) (an argument waived and abandoned when it was briefly mentioned in the summary of the argument, but was not otherwise briefed); *Laborers' Int'l Union of N. America, AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("'a passing reference to an issue . . . will not suffice to bring that issue before this court.'")).  In any event, given the 1100-page administrative record with 800 pages of medical records, Plaintiff was not entirely precluded from treatment and the ALJ did not penalize Plaintiff for any failure to obtain further treatment.  (Tr. 19-21).

Sixth, Plaintiff asserts that the ALJ erred by failing to include additional RFC limitations for ulcerative colitis given testimony regarding "extensive" bathroom use requiring unscheduled breaks.  (D.I. 28 at 7-8).  The ALJ, however, fully considered Plaintiff's ulcerative colitis in his decision.  (Tr. 20-21).  For example, the ALJ noted that at the beginning of the period, Plaintiff had a *C. diff* infection causing diarrhea that resolved with antibiotics and did not have another infection after July 2017.  (Tr. 20, 424, 435, 479, 482-83, 510-22).  The ALJ also recognized that Plaintiff's ulcerative colitis improved with Remicade.  (Tr. 21, 622, 921-24, 926, 928, 930, 976, 1000, 1047).  And the ALJ agreed with the state agency physicians that Plaintiff could perform a range of light work despite his ulcerative colitis.  (Tr. 21, 73-75, 91).  As the Report correctly noted, the ALJ was "entitled to agree with the state agency doctors who were aware of Plaintiff's ulcerative colitis and did not recommend an additional limitation to account for future anticipated

diarrhea." (D.I. 27 at 6).  And although Plaintiff argues that the "ALJ included zero restrictions" stemming from his ulcerative colitis (D.I. 28 at 8), that is not the case.  The ALJ included exertional, postural, and environmental restrictions to account for Plaintiff's credibly established limitations.  (Tr. 18).

As for Plaintiff's legal arguments on this issue (D.I. 28 at 8), SSR 15-1p only applies to interstitial cystitis (a bladder condition), which Plaintiff does not have.  *See* SSR 15-1p, 2015 WL 1292257.  And, neither SSR 96-9p nor POMS DI 25025.030 create an express articulation requirement with respect to unscheduled breaks relating to bathroom needs.  *See* SSR 96-9p, 1996 WL 374185; POMS DI 25025.030, found at https://secure.ssa.gov/poms.nsf/lnx/0425025030.[3]

Finally, Plaintiff asserts that the ALJ failed to account for his depression and anxiety, asserting that the ALJ used his "lay judgment" to decide these impairments did not exist, and that the ALJ was required to develop the record on this point.  (D.I. 28 at 9).  The evidence, however, does not support Plaintiff.  Neither Plaintiff nor his father made any mention of his depression at the hearing.  (Tr. 42-52).  Plaintiff's father referenced memory issues (Tr. 20, 47-48), but objective examinations showed no cognitive deficits (Tr. 20, 621, 624, 930, 97, 987, 1048).  Additionally, the record shows only a few instances of flat affect or low mood, but otherwise showed that

---

[3]     Plaintiff's case citations are likewise distinguishable.  In *Martin*, the claimant reported 20 bowel movements a day with eight hours per day in the bathroom; those reports were corroborated over two years in the medical record.  *Martin v. Comm'r of Soc. Sec.*, No. 21-5-J, 2022 WL 486894, at *3 (W.D. Pa. Feb. 17, 2022).  In *Montanez*, the ALJ discounted Plaintiff's statement that she needed breaks to use the bathroom 8-14 times per day, but at the same time "expressly relied" on Plaintiff's bathroom use (located upstairs) to find she retained the capacity to climb stairs.  *Montanez v. Saul*, No. 3:18-CV-01913, 2019 WL 4439577, at *7 (M.D. Pa. Aug. 19, 2019), adopted by 2019 WL 4412914 (M.D. Pa. Sept. 16, 2019).  And in *Ressler*, the parties did not challenge the RFC limitation with respect to bathroom breaks, but only how the ALJ interpreted the VE's ambiguous testimony as to a break-related limitation.  S*ee Ressler v. Comm'r of Soc. Sec.*, No. 18-402, 2019 WL 3936553, at *3 (W.D. Pa. Aug. 20, 2019).  The facts here are different from each of these cases.

Plaintiff was interactive and normal, with no obvious anxiety or depression. (Tr. 447, 452, 621, 624, 971, 987, 1009, 1069, 1082). Plaintiff did not point to evidence suggesting any mental limitation (such as time off task) was appropriate given the record, and the record simply failed to show that any psychological issues prevented him from performing work functions.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court overrules Plaintiff's objections, adopts the Report, denies Plaintiff's motion for summary judgment, and grants Defendant's cross-motion for summary judgment. An appropriate order will follow.